# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**TERRY BUSSEY,**

     **Plaintiff**

**v.**                                     **1:16-cv-906 MCA LF**

**ASHTON B. CARTER,**
**Secretary of the UNITED STATES**
**DEPARTMENT OF DEFENSE,**

     **Defendant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant Department of Defense's *Motion for Summary Judgment* [Doc. 28]. The Court has considered the parties' submissions and the relevant law, and is otherwise fully informed. For the following reasons, the Court **GRANTS in part** and **DENIES in part** Defendant's *Motion*.

### I.   Background

Plaintiff Terry Bussey (Plaintiff or Mr. Bussey), who is African American, began his employment with the federal government in 1987. [Doc. 1, ¶¶ 6, 8] In 1999, he began working for the Defense Threat Reduction Agency (DTRA) at the Department of Defense (DOD or Defendant). [Doc. 1, ¶¶ 6, 7] Paul Collins began working for DTRA and supervising Mr. Bussey in 2012. [Doc. 28-1, Collins Depo, 8:19-9:11] Mr. Collins was supervised by Calvin Conger, who was located in Washington, D.C. [Doc. 28-1, Collins Depo, 9:14-15, 34:9-14; Doc. 28-2, Conger Depo, 7:3-12] At times relevant to

his *Complaint*, Mr. Bussey was in charge of the vehicles assigned to Mr. Collins' department.  [Doc. 28, ¶ 7; Doc. 32, ¶ 7]  In early 2015, Mr. Collins verbally assigned Mr. Bussey the additional role of "building manager."  [Doc. 28, ¶ 14; Doc. 32, ¶ 14]

After Mr. Collins issued a series of disciplinary notices to Mr. Bussey in 2015, Mr. Bussey was removed from his position on January 5, 2016.  [Doc. 28, ¶ 51; Doc. 32, ¶ 51]  After Mr. Bussey was removed, he filed an appeal with the Merit Systems Protection Board (MSPB).  [Doc. 28, ¶ 59; Doc. 32, ¶ 59]  The MSPB held a hearing and issued an Initial Decision affirming the removal, which became final on July 11, 2016.  [Doc. 28, ¶ 60; Doc. 32, ¶ 60]  Consistent with 5 U.S.C. § 7703(b)(2), Mr. Bussey timely filed the present lawsuit on August 9, 2016.  [Doc. 28, ¶ 61; Doc. 32, ¶ 61]  In his *Complaint*, Mr. Bussey alleges that "Defendant has discriminated against Bussey in the terms and conditions of his employment on the basis of his race in violation of Title VII." [Doc. 1]  *See* 42 U.S.C. § 2000e.  He also alleges that "Defendant retaliated against Bussey in the terms and conditions of his employment in violation of Title VII for participating as a witness and for previous EEO filings," and that "Bussey engaged in a protected disclosure of fraud and waste to the Inspector General's Office [and] was subject to an adverse employment action in being disciplined and removed from federal service."  [Doc. 1]  *See* 42 U.S.C. § 2000e; Whistleblower Protection Enhancement Act of 2012 (WPEA), Pub. L. No. 112-199, 126 Stat 1465 (2012).  Mr. Bussey thus raises two claims based on Title VII (discrimination claims) and one claim based on the WPEA (a non-discrimination claim).  *See Dossa v. Wynne*, 529 F.3d 911, 915 (10th Cir. 2008)

(stating that "Title VII includes retaliation claims and § 7703(b)(2) authorizes judicial review of them").

## II.  Discussion

Where, as here, "a petition for review of a MSPB decision involves both discrimination and other claims it is considered a 'mixed case.'" *Williams v. Rice*, 983 F.2d 177, 179–80 (10th Cir. 1993).  "Normally, . . . the Federal Circuit has exclusive jurisdiction over appeals from the MSPB, except where, as here, the appellant's claim includes an allegation of discrimination." *Id.*; *see* 5 U.S.C. § 7703(b)(1).  The Court reviews the Title VII-based discrimination claims de novo, but "[t]he other, non-discrimination claims, . . . are reviewed on the administrative record." *Williams*, 983 F.2d at 179–80; *see Morales v. Merit Sys. Prot. Bd.*, 932 F.2d 800, 802 (9th Cir. 1991) (recognizing that a Title VII retaliatory discharge case was properly considered de novo); 5 U.S.C. § 7703(c).  The Court will address Mr. Bussey's claims in reverse order, starting with the WPEA retaliation claim (Count 3).

## A. WPEA Retaliation Claim[1]

Under *Williams*, 983 F.2d at 179–80, Plaintiff's non-discrimination claim is reviewed deferentially and the MSPB decision may be reversed only when it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c).

Defendant argues that Plaintiff's retaliation claim should be dismissed because Mr. Bussey has failed to file the administrative record. [Doc. 28, pg. 25] It points to Federal Rule of Appellate Procedure 10, which requires an appellant to file the record of district court proceedings with the appellate court. [Doc. 28, pg. 25] Defendant's argument is unavailing, however, because Rule 10 does not apply to appeals in district court of administrative adjudications. Instead, Rules 16 and 17 govern those appeals, and Rule 17 provides that "[t]he *agency* must file the record . . . within 40 days after being served with a petition for review, unless the statute authorizing review provides

---

[1] To the extent Defendant argues that Plaintiff failed to explicitly appeal the MSPB decision and therefore the MSPB decision should be affirmed, [Doc. 28, pg. 24] the Court disagrees that Plaintiff's *Complaint* is insufficient in this regard. Under § 7703(b)(2), "[c]ases of [race] discrimination subject to the provisions [governing appeals of MSPB decisions] shall be filed under section 717(c) of the Civil Rights Act of 1964 (42 U.S.C. 2000e-16(c))" and "any such case filed . . . must be filed within 30 days after the date the individual filing the case received notice of the judicially reviewable action under such section 7702." Plaintiff cites 42 U.S.C. § 2000e in the discrimination claim, [Doc. 1] and Defendant acknowledges that the MSPB decision was final on July 11, 2016 and that "Plaintiff timely filed this lawsuit." [Doc. 28, ¶¶ 60-61] In addition, in the *Complaint*, Plaintiff references the MSPB decision by stating that he "has exhausted his administrative remedies." [Doc. 1, ¶ 5] Finally, Defendant acknowledges that Plaintiff's *Complaint* constitutes an appeal of the MSPB retaliation decision by arguing that the absence of the administrative record precludes review by this Court. [Doc. 28, pg. 24]

otherwise." (Emphasis added.) *See Singh v. Ashcroft*, 367 F.3d 1139, 1147–48 (9th Cir. 2004) (Hawkins, J., dissenting) (noting that the rule governing filing of the record for appeals of district court decisions differs from that governing appeals of administrative adjudications); *Gearan v. Dep't of Health & Human Servs.*, 838 F.2d 1190, 1191 (Fed. Cir. 1988) ("Pursuant to Fed.R.App.P. 17, the agency must file the record with the Clerk of the court."); *Pitman v. United States Citizenship & Immigration Servs.*, No. 2:17-CV-0166-CW-EJF, 2017 WL 5991738, at *2 (D. Utah Dec. 1, 2017) (stating that "it is the government's burden to file the administrative record in [Administrative Procedures Act] review cases and to certify that it is complete," citing Rule 17); 16AA Fed. Prac. & Proc. Juris. § 3963 (4th ed.) ("It is the duty of the agency, in both review and enforcement proceedings, to file the record as defined in Rule 16(a) . . . within 40 days after being served with a petition for review, unless a statute prescribes a different time.").

The Court shall therefore order Defendant to cause the record of proceedings before the MSPB to be filed consistent with Rule 16 and 17 of the Federal Rules of Appellate Procedure. *See Luther v. Gutierrez*, 618 F. Supp. 2d 483, 496 (E.D. Va. 2009) (stating that the defendant had been directed "(i) to assemble for filing the MSPB administrative record, [and] (ii) to meet and confer with plaintiff to assure that the record was reasonably complete and contained all of the materials necessary to resolve plaintiff's CSRA claim" by a certain date).

Moreover, to the extent Defendant relies on the summary judgment standard and attaches portions of the administrative record to support its assertions, this approach is unavailing. The Tenth Circuit held in *Olenhouse* that summary judgment procedures do

not apply to review of agency decisions governed by the Administrative Procedures Act (APA), like the MSPB decision here. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579–80 (10th Cir. 1994). The Court held that

> [the summary judgment] process, at its core, is inconsistent with the standards for judicial review of agency action under the APA. The use of motions for summary judgment or so-called motions to affirm permits the issues on appeal to be defined by the appellee and invites (even requires) the reviewing court to rely on evidence outside the administrative record. Each of these impermissible devices works to the disadvantage of the appellant. We have expressly disapproved of the use of this procedure in administrative appeals in the past, and explicitly prohibit it now.

*Id*. It went on, "Reviews of agency action in the district courts must be processed *as appeals* . . . . Motions to affirm and motions for summary judgment are conceptually incompatible with the very nature and purpose of an appeal." *Id*. at 1580.

Faced with a motion for summary judgment concerning an appeal of an administrative decision, some courts have concluded that they could "[i]gnore the summary judgment standards and treat the pending motions for summary judgment and responses and replies filed by each of the parties as briefs of the respective parties," reasoning that the parties had a full opportunity to advance their arguments and that this approach is "the most expeditious and beneficial to the parties." *Logan Farms, Inc. v. Espy*, 886 F. Supp. 781, 785 (D. Kan. 1995). However, in *Logan Farms, Inc.*, the complete administrative record had been filed. *Id*. at 789. That is not the case here.

In its appellate capacity, the Court is obliged to assess whether an agency's action "was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and if it was "unsupported by substantial evidence in the hearing record."

*Olenhouse*, 42 F.3d at 1573-74 (internal quotation marks and citation omitted); *see* 5 U.S.C. § 7703(c); 5 U.S.C. § 706(2) (a provision of the APA defining the judicial scope of review). "These standards require the reviewing court to engage in a 'substantial inquiry'" of the entire record. *Olenhouse*, 42 F.3d at 1574. Because the record has not been filed here, the requisite "substantial inquiry" is impossible.

Because summary judgment on the retaliation claim is foreclosed by *Olenhouse* and because the complete record has not been filed, Defendant's *Motion* will be denied as to Plaintiff's WPEA retaliation claim (Count 3).

## B. Plaintiff's Discrimination Claims (Counts 1 and 2)

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this Rule, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993) (citations omitted). The moving party need not negate the nonmovant's claim, but rather must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for

trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc*., 912 F.2d 1238, 1241 (10th Cir. 1990) (citation omitted). The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment, *see Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988), but rather must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks and citation omitted). If the responding party fails to properly address the movant's assertion of fact as required by Rule 56(c), a district court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). Upon a motion for summary judgment, a district court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co*., 985 F. Supp. 1277, 1281 (D. Kan. 1997).

1. **Undisputed and Disputed Facts**

a. *Disciplinary Notices*

    The following facts are undisputed except as noted.[2] Where they are disputed, the Court will set out the alleged facts as stated by each party. For the most part, Mr. Bussey states that he disputes the facts stated by Defendant. However, in several cases, noted

---

[2] Pursuant to DNM Local Rule Civ. 56.1(b), "[a]ll material facts set forth in the [motion for summary judgment are] deemed undisputed unless specifically controverted."

below, he either denies the allegation in a general manner, or, rather than disputing the facts, provides an explanation for his conduct. Such "denials" are insufficient under Local Rule 56.1(b) to dispute a statement of fact. Moreover, although the Court reviewed Mr. Bussey's responses to Defendant's statement of facts, the focus of the Court's analysis is on the facts as they appeared to Mr. Collins and Mr. Conger at the time that they made the decision to remove Mr. Bussey from his position, as discussed further below. Thus, although Mr. Bussey adduces evidence *in this Court* to show that Mr. Collins's descriptions of certain events were inaccurate, that evidence is immaterial to the Court's assessment of whether the evidence before Mr. Collins and Mr. Conger when they decided to remove Mr. Bussey supported a good faith belief those events occurred as described.

Beginning in January 2015, Mr. Bussey received a series of disciplinary notices. The first, a "letter of reprimand," was based on Mr. Bussey's alleged failure to follow instructions in November 2014. [Doc. 28-3] The letter of reprimand first described an instance in which, after Mr. Collins requested that Mr. Bussey submit reports on vehicles by the 10th of each month, Mr. Bussey did not submit the November 2014 report and it was instead submitted by another employee. [Doc. 28, ¶¶ 9, 10; Doc. 32, ¶¶ 9, 10; Doc. 32-1, pg. 7, Bussey Depo] It also stated that on November 6 and November 18, 2014, Mr. Collins requested that Mr. Bussey prepare an inventory report on certain vehicles by December 9, 2014. [Doc. 28, ¶ 11; Doc. 32, ¶ 11] Mr. Bussey did not agree with Mr. Collins about how to assess the vehicles or prepare the report and communicated his concerns to Mr. Collins via email. [*Id.*; Doc. 32-1, pg. 13] Mr. Collins responded,

affirming his instructions for completing the task. [Doc. 32-1, pg. 12] Mr. Bussey did not sign the report because he did not agree with the way Mr. Collins instructed him to conduct the inventory and assessment. [Doc. 32, ¶ 11-12; Doc. 32-1, pg. 2, Bussey Depo, pg. 21; Doc. 34, pg. 4] Mr. Collins completed the report instead. [Doc. 28, ¶ 11; Doc. 32, ¶ 11]

In August 2015, Mr. Collins issued to Mr. Bussey a "Notice of Proposed 5-Day Suspension" citing "conduct unbecoming a federal employee" and "failure to follow instructions and disrespect towards your supervisor." [Doc. 28-5] In the Notice, he described an incident on June 11, 2015, during which Mr. Collins, as he "caught up with [Mr. Bussey] and the inspection team" near a DTRA building, observed Mr. Bussey "speaking in a very loud angry voice" to a security escort who was questioning whether a group of inspectors had approval to take pictures in one of the DTRA buildings. [Doc. 28-5] Mr. Collins stated that Mr. Bussey "yelled and berated the individual by yelling, I am in charge. If they got their cameras past the guard shack then they are allowed to use them." [Doc. 28-5] He also stated that he, Mr. Collins, "asked [Mr. Bussey] to stand down [and] back away" and then told Mr. Bussey that he had "handled the situation with the security escort unprofessionally" and that it was part of his job to assist with the inspection. [Doc. 28-5] Mr. Collins wrote that Mr. Bussey "responded by walking away yelling 'I don't have a fucking job.'" [Doc. 28-5]

Mr. Bussey generally denies these allegations, stating that Defendant failed to obtain a statement from the security escort and instead relies only on Mr. Collins's own memorandum detailing the incident. [Doc. 32, ¶¶ 18-19] He does not otherwise argue

that Mr. Collins' memorandum is inaccurate.  [*Id.*]  In his *Response*, Mr. Bussey also submits the testimony of a witness at his MSPB hearing who was part of the group of inspectors, who described Mr. Bussey as "very friendly" and "smiling sunshiny."  [Doc. 32, ¶ 18; Doc. 32-1, pg. 26]  She stated that she saw him at "the gate" where the group received visitors' badges.  [Doc. 32-1, pg. 26-27]  The location of the "gate" is not described further.  However, Mr. Collins' memorandum and the description in the Notice state that Mr. Bussey "escorted [the witness] and other team members toward the Electrical Life Safety project under way in the main compound," and that Mr. Collins observed Mr. Bussey yelling at the security escort "as [he] caught up with [Mr. Bussey] and the inspection team."  [Doc. 28-5]  Hence, it is not clear that the encounter described by the witness occurred at the same location and at the same time as the events described by Mr. Collins.

The Notice of Proposed 5-Day Suspension also described an incident on August 12, 2015 in which Mr. Collins requested that Mr. Bussey, as building manager, change a light bulb in an office.  [Doc. 28-5]  Mr. Collins wrote that Mr. Bussey responded that it was not his job to do so, and that Mr. Collins told Mr. Bussey, "you are the building manager[,] it's your job responsibility to take care of the lights so please get it done." [Doc. 28-5]  According to the Notice, Mr. Bussey left the building, indicating that he was going to the Post Office.  [Doc. 28-5]  Another employee ultimately changed the light bulb.  [Doc. 28-5]

Mr. Bussey states that he disputes Mr. Collins' description of the incident.  [Doc. 32, ¶ 21]  However, the evidence he cites does not contradict Defendant's assertions that

Mr. Bussey was asked to change the light bulb and that he did not do so. [Doc. 21, ¶ 21; Doc. 32-1, pg. 5, 30:7-32:1] Moreover, Mr. Bussey admitted in his deposition that it was the building manager's duty to address an inoperable light bulb. [Doc. 32-1, pg. 5, Bussey Depo, 30:15-18]

In September 2015, Mr. Collins rescinded the Proposed 5-Day Suspension and issued a Notice of Proposed 14-Day Suspension. [Doc. 28-11; Doc. 28-12] The Notice of Proposed 14-Day Suspension included the June and August incidents described above, as well as instances of alleged failures to comply with leave procedures and lack of candor. [Doc. 28-12] In July 2015, Mr. Collins had sent his staff, including Mr. Bussey, an email detailing procedures to be followed when leaving their work areas, using government vehicles, and for leave requests. [Doc. 28, ¶ 24; Doc. 32, ¶ 24] In the email, Mr. Collins specified that all employees must notify him or the CPF Coordinator when they left their respective work areas. [Doc. 28-12; Doc. 28-6; Doc. 28, ¶ 24; Doc. 32, ¶ 24] In the Notice of Proposed 14-Day Suspension, Mr. Collins described asking Mr. Bussey about his whereabouts from 0630-0830 hours on September 9, 2015. In response, Mr. Bussey stated that he had been in the bathroom and in another area on the base. However, badge entry logs indicated that Mr. Bussey entered the base at 0829 hours. [Doc. 28, ¶¶ 25, 26; Doc. 32, ¶¶ 25, 26; Doc. 28-12] Mr. Bussey disputes this account, and states that on September 9 he arrived at 0630 and went immediately to another area of the base and therefore could not notify Mr. Collins that he would be out of the office. [Doc. 32, ¶ 26] He also argues that the change in procedures prevented him from doing his work properly. [*Id.*; Doc. 32-1, pg. 9, 82:8-84:10]

The Notice of Proposed 14-Day Suspension also cites Mr. Bussey's absence from work on the following day, September 10, without prior approval from or notice to Mr. Collins, contrary to the leave procedures. [Doc. 28, ¶ 27; Doc. 28-12] Mr. Bussey responds to this assertion of by stating that he "was sick in the morning and went to the doctor" and "had to wait to get a doctor's note after his appointment." [Doc. 32, ¶ 27] He goes on, "Plaintiff prepared a sick leave form with a prescription receipt as evidence." [*Id*.] These assertions do not address whether Mr. Bussey complied with the leave procedures. Moreover, the evidence to which Mr. Bussey points in support of his contentions—his deposition—appears to address a different date. Mr. Bussey stated that "[Mr. Collins] knew I was leaving, and he sent me an email back on a Friday, which I don't work on Fridays. . . . He sent an e-mail on a Friday telling me that I was AWOL on that Monday. That Monday I didn't come in because I was still at the dental office, and I had a prescription filled somewhere in there." [Doc. 32-1, pg. 11, 106:12-18] However, September 10, 2015 fell on a Thursday, not a Monday. Thus, Mr. Bussey's testimony does not address the Thursday, September 10 absence cited in the Notice.

Finally, Mr. Collins described noticing on September 16 that Mr. Bussey was not in his office at 0700 hours, and asking Mr. Bussey the next day about his location. [Doc. 28, ¶ 28; Doc. 28-10; Doc. 28-12] Mr. Bussey stated that he was in the office on the morning of September 16. [Doc. 28, ¶ 28; Doc. 28-10; Doc. 28-12] Mr. Collins reported in the Notice that he checked the badge logs, which indicated that Mr. Bussey had not arrived until 0716. [Doc. 28, ¶ 28; Doc. 28-10; Doc. 28-12] While Mr. Bussey states that he disputes the allegations, he does not point to any contrary evidence and states only

that "he was harassed by Mr. Collins regarding his log-in times." [Doc. 32, ¶ 28 (citing Mr. Collins' September 17 email stating why Mr. Collins was rejecting Mr. Bussey's timecard)]

On November 9, 2015, Mr. Collins rescinded the Notice of Proposed 14-Day Suspension and issued a Notice of Proposed Removal. [Doc. 28, ¶¶ 35, 36] Mr. Bussey was afforded an opportunity to respond to the Notice in writing, which he did. [Doc. 28-15; Doc. 32, ¶ 41; Doc. 32-1, Conger Depo, pg. 16, 12:6-12] The Notice of Proposed Removal cited all of the incidents described in the Notice of Proposed 14-Day Suspension and two additional incidents. [Doc. 28-13] The first of these additional incidents was a telephone call with another employee during which Mr. Bussey was alleged to have acted "unprofessionally" and "rude[ly]" when he refused to go to the colleague's office and hung up on the colleague. [*Id*.; Doc. 28, ¶ 33] The charge in the Notice related to this incident was "conduct unbecoming a federal officer." [Doc. 28-13] Mr. Bussey denies that he behaved rudely and that he hung up on the colleague. [Doc. 32, ¶ 33; Doc. 28-15] In his written response to the Notice, Mr. Bussey did not deny that he and the colleague disagreed during a telephone conversation and that the call ended abruptly. [Doc. 28-15] However, he maintained that the colleague may have caused the call to terminate. [*Id*.] He also did not deny that the colleague asked him to come to the colleague's office, but that Mr. Bussey refused to do so. [Doc. 28-15] He stated that he and the colleague "have not agreed on anything since [Mr. Bussey's] arrival at DTRA in 1999." [Doc. 28-15]

The second additional incident detailed in the Notice of Proposed Removal occurred in October 2015, when Mr. Bussey approached a van in which a group of visitors were seated. [Doc. 28-13; Doc. 28, ¶ 34] Several DTRA staff members were also in or near the van. [Doc. 28-13; Doc. 28-15] One of the DTRA staff members reported that Mr. Bussey asked them, "What the fuck are you doing?" and then continued to question the DTRA personnel using profanity, even though they requested that he refrain. [Doc. 28-13; Doc. 32-1, pg. 28 (statement by one of the drivers)] The charge in the Notice related to this incident is titled "abusive language toward co-workers." [Doc. 28-13] In both his response to the Notice and *Response* to Defendant's *Motion*, Mr. Bussey does not dispute that he approached the van and used profanity, but maintains that one of the DTRA staff members was "hostile" and that he was concerned "that something illegal was going on." [Doc. 28-15; Doc. 32, ¶ 34]

Defendant asserts that each step of discipline was reviewed with Human Resources personnel and approved by Mr. Conger before it was issued to Mr. Bussey. [Doc. 28, ¶¶ 39, 40] Defendant submits testimony by a DTRA Human Resources representative who testified at the MSPB hearing that he assisted Mr. Collins in preparing the letter of reprimand and "[g]ot that coordinated through the legal department and back to Mr. Collins." [Doc. 34-2] Mr. Bussey generally denies these facts, but as evidence in support of his denial points only to the lack of signature by a Human Resources representative or Mr. Conger on the disciplinary notices. [Doc. 32, ¶¶ 39, 40] He adduces no evidence indicating that such signatures are required. Hence, his assertions do not contradict Defendant's.

It is undisputed that Mr. Conger reviewed the Notice of Proposed Removal and Mr. Bussey's response to it, then made the final decision regarding removal. [Doc. 28, ¶¶ 43, 50; Doc. 32, ¶¶ 43, 50]

*b. MSPB and Whistleblowing Activities*

Mr. Bussey contends that the disciplinary actions, including his removal, were due in part to his participation in protected conduct. [Doc. 1 (alleging retaliation for MSPB and EEO activity and reporting fraud and waste allegations to the Inspector General)] In 2014 or early 2015, just before the letter of reprimand was issued, Mr. Bussey was a witness in an MSPB hearing for another DTRA employee (the protected conduct). [Doc. 1, ¶ 10; Doc. 28, ¶ 17; Doc. 32, ¶ 17]

It is undisputed that Mr. Collins was aware before the letter of reprimand was issued that Mr. Bussey had testified in the MSPB hearing. [Doc. 28, ¶ 17; Doc. 32, ¶ 17; Doc. 32-1, pg. 22; Doc. 28-1, pg. 4, Collins Depo, 16:2 (Mr. Collins stating that he believed that Mr. Bussey testified before the letter of reprimand was issued)] The MSPB hearing occurred in "early 2015" and the letter of reprimand was issued on January 21, 2015. [Doc. 28, ¶ 17; Doc. 32, ¶ 17] Mr. Collins stated in his deposition that, while he knew that Mr. Bussey was a witness in the MSPB hearing, he did not know any details about the claims or the hearing. [Doc. 28, ¶ 17] Mr. Bussey disputes this assertion and attached his testimony from the MSPB hearing on his removal stating that he discussed the hearing with Mr. Collins and that Mr. Collins commented on the individuals involved. [Doc. 32, ¶ 17; Doc. 32-1, pg. 22] Regardless of whether this conversation occurred, it is undisputed that Mr. Collins was aware of Mr. Bussey's involvement in the hearing as a

witness before issuing the letter of reprimand.  Similarly, the parties agree that Mr. Conger was aware that Mr. Bussey had participated in an Equal Employment Opportunity (EEO) action.[3]  [Doc. 28, ¶ 54; Doc. 32, ¶ 54]

## 2.  Analysis

Within the context of a motion for summary judgment on discrimination claims, courts apply the *McDonnell Douglas* burden shifting framework.  *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000) (stating that "the three-part *McDonnell Douglas* burden-shifting analysis is limited to the summary judgment context").  Under this framework,

> the plaintiff "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination."  Once the plaintiff has established a prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its employment action.  If the defendant makes this showing, the plaintiff must then show that the defendant's justification is pretextual.

*Id.* (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)).

In order to demonstrate a prima facie discriminatory discharge claim, a plaintiff must show that "(1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge."  *Kendrick*, 220 F.3d at 1229.  [Doc. 28, pg. 15; Doc. 32, pg. 18]  The parties differ on whether Mr. Bussey is also required to demonstrate that similarly situated

---

[3] Mr. Bussey alleges in his *Complaint* that "Defendant retaliated against Bussey in the terms and conditions of his employment in violation of Title VII for participating as a witness and for previous EEO filings."  [Doc. 1, ¶ 30]  It is not clear from the parties' asserted facts whether Mr. Conger's reference in his deposition to "another EEO proceeding for another employee" was to the same MSPB hearing referenced by Mr. Collins or to a different proceeding.  [Doc. 28, ¶ 54; Doc. 32, ¶ 54]

employees were treated differently from Plaintiff. [*Compare* Doc. 28, pg. 16 (Defendant

arguing that Mr. Bussey must demonstrate this additional element) *with* Doc. 32, pg. 18

(Mr. Bussey arguing that he is not required to demonstrate this element)]

    Our Tenth Circuit has held that "comparison to a person outside of the protected

class [in a] prima facie case is unnecessary to create an inference of discriminatory

discharge." *Id.* (citing *Perry v. Woodward,* 199 F.3d 1126, 1140 (10th Cir.1999)). The

Tenth Circuit explained that

> [w]hen viewed against the backdrop of historical workplace discrimination,
> an employee who belongs to a racial minority and who eliminates the two
> most common, legitimate reasons for termination, i.e., lack of qualification
> or the elimination of the job, has at least raised an inference that the
> termination was based on a consideration of impermissible factors. The
> firing of a qualified minority employee raises the inference of
> discrimination because it is facially illogical to randomly fire an otherwise
> qualified employee and thereby incur the considerable expense and loss of
> productivity associated with hiring and training a replacement.

*Id.* However, evidence of the treatment of similarly situated employees is an element of

"[a] prima facie case of racial discrimination based upon disparate *treatment*," which

"requires a plaintiff to show: '(1) that [s]he is a member of a [protected class], (2) that

[s]he suffered an adverse employment action, and (3) that similarly situated employees

were treated differently.'" *Juarez v. Utah*, 263 F. App'x 726, 737–38 (10th Cir. 2008)

(unpublished) (emphasis added) (quoting *Trujillo v. Univ. of Colo. Health Sciences Ctr.,*

157 F.3d 1211, 1215 (10th Cir.1998)).

    Here, Defendant argues that the only adverse employment action Mr. Bussey can

show is his removal from his position and, therefore, that Mr. Bussey's claim is limited to

discriminatory discharge. [Doc. 28, pg. 16] Mr. Bussey argues to the contrary that "Mr.

Collins harassed Plaintiff and proposed multiple suspensions in 2015," that Mr. Bussey was "not provided an opportunity to respond to Mr. Collins' proposed suspensions," and that "[Mr. Bussey] was the only one who was disciplined for not following instructions regarding the vehicle fleet." [Doc. 32, pg. 18-19] Moreover, Mr. Bussey's *Complaint* alleges that "Defendant has discriminated against Bussey in the *terms and conditions of his employment* on the basis of his race in violation of Title VII" and that "[t]he discrimination consisted of Defendant subjecting Bussey to *disparate treatment in regards to discipline and removal* from federal service." [Doc. 1, ¶¶ 26, 27 (Emphasis added.)] Thus, to the extent Mr. Bussey is alleging both discriminatory discharge and discriminatory treatment, the Court will assess the present *Motion* as applied to both claims.

*a. Discriminatory Discharge*

To reiterate, the elements of a prima facie discriminatory discharge claim are "(1) [the plaintiff] belongs to a protected class; (2) [the plaintiff] was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge." *Kendrick*, 220 F.3d at 1229.

The parties do not dispute that Mr. Bussey belongs to a protected class, that he was discharged, and that his position was not eliminated after his discharge. [Doc. 28, ¶¶ 3, 51, 58; Doc. 32, ¶¶ 3, 51, 58, pg. 19] The first, third, and fourth elements are therefore met, and the remaining question is whether Mr. Bussey was qualified for his position.

A plaintiff may show that she is qualified "by credible evidence that she continued to possess the objective qualifications she held when she was hired, . . . or by her own

testimony that her work was satisfactory, even when disputed by her employer, . . . or by evidence that she had held her position for a significant period of time." *MacDonald*, 941 F.2d at 1121 (citations omitted). Here, it is undisputed that "Plaintiff began his employment with the federal government in 1987" and that he "began working for . . . DTRA . . . in 1999." [Doc. 28, ¶ 1; Doc. 32, ¶ 1] It is also undisputed that the letter of reprimand issued by Mr. Collins in September 2014 was the first time Mr. Bussey had been disciplined since joining DTRA. [Doc. 32, ¶ 13; Doc. 34, pg. 4] Moreover, Defendant does not argue that Mr. Bussey was unqualified for his position. These undisputed facts are sufficient to demonstrate that Mr. Bussey was qualified and, therefore, to satisfy the second element of the prima facie case of discriminatory discharge. *Id.* (stating that the plaintiffs had satisfied their burden on this issue where they showed that "plaintiffs had held their positions for four years and both presented evidence that they had never been disciplined or received unfavorable performance reviews until recently" and that "[b]oth described the satisfactory nature of their work performance").

Defendant argues that Mr. Bussey has failed to establish a prima facie case because he has failed to identify "any other similarly situated individual who engaged in a comparable series of egregious and unprofessional behavior[s], who was not similarly disciplined" and because his discharge was justified by his behavior. [Doc. 28, pg. 16-17] As discussed, comparison to a similarly situation individual is not an element of a prima facie case for discriminatory discharge. *Trujillo*, 157 F.3d at 1215. Moreover, "[a] defendant's evidence regarding an employee's work performance should not be

considered when determining whether the employee has made a prima facie case of employment discrimination." *Ellison v. Sandia Nat'l Labs*, 60 F. App'x 203, 205 (10th Cir. 2003) (unpublished) (citing *MacDonald v. E. Wyoming Mental Health Ctr.*, 941 F.2d 1115, 1119-20 (10th Cir. 1991) (abrogated on other grounds by *Randle v. City of Aurora*, 69 F.3d 441, 445 (10th Cir. 1995))). This is so because consideration of this evidence as part of a plaintiff's prima facie case

> raises serious problems under the *McDonnell Douglas* analysis, which mandates a full and fair opportunity for a plaintiff to demonstrate pretext. Short-circuiting the analysis at the prima facie stage frustrates a plaintiff's ability to establish that the defendant's proffered reasons were pretextual and/or that [race] was the determining factor; if a plaintiff's failure to overcome the reasons offered by the defendant for discharge defeats the plaintiff's prima facie case, the court is then not required to consider plaintiff's evidence on these critical issues.

*MacDonald*, 941 F.2d at 1119. Instead, "the employer's evidence [as to the plaintiff's job performance] is properly considered in addressing whether [the employer's] articulated reasons [for discharge] are legitimate or merely a pretext for discrimination." *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1470 (10th Cir. 1992).

Since all four elements of the prima facie case are met, Mr. Bussey has met his burden on this prong of the *McDonnell Douglas* framework. *See Kenworthy*, 979 F.2d at 1469 (stating that the burden to make a prima facie case is "not onerous") (internal quotation marks and citation omitted); *Gibson v. Mabrey Bank*, No. 14-CV-0770-CVE-FHM, 2015 WL 5098698, at *6 (N.D. Okla. Aug. 31, 2015) (concluding that where the plaintiff demonstrated that she was qualified, and "all other elements of the prima facie

case are either uncontested or substantiated by evidence, plaintiff has established a prima facie case of discriminatory termination").

The burden therefore shifts to Defendant "to articulate some legitimate, nondiscriminatory reason for its employment action." *Kendrick*, 220 F.3d at 1226 (internal quotation marks and citation omitted). Defendant points to "numerous examples of Plaintiff's rude behavior, unacceptable conduct and defiance of policy and directions" and attached each of the written notices of disciplinary action taken against Plaintiff, which detail the alleged unacceptable behavior. [Doc. 28] Hence, Defendant has sufficiently articulated a nondiscriminatory reason for Plaintiff's discharge. *See id.* at 1230 (holding that the employer met its burden where it "asserted that [the plaintiff] was discharged for gross insubordination after . . . [the] Human Resources Manager[] concluded that [the plaintiff] verbally abused and had physical contact with a supervisor based upon uncontroverted information").

The burden now shifts back to Mr. Bussey to "show that the defendant's justification is pretextual." *Id.* at 1226. Pretext may be shown by "evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 490 (10th Cir. 2006) (internal quotation marks and citations omitted). "In determining whether a plaintiff's evidence of pretext is sufficient to permit an inference of discrimination and thereby avoid summary judgment, the Supreme Court

has noted relevant factors 'includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered' on a motion for summary judgment." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1169 (10th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148–49 (2000)). "Evidence that the employer should not have made the termination decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility." *Swackhammer,* 493 F.3d at 1169–70. Instead, the relevant inquiry is "whether [the employer] honestly believed those [proffered] reasons and acted in good faith upon those beliefs." *Id*. at 1170. "The employer is entitled to summary judgment if the employee could not offer evidence tending to show the defendant's innocent explanation for his employment decision was false." *Trujillo,* 157 F.3d at 1215 (internal quotation marks and citation omitted).

Here, Plaintiff's argument regarding pretext consists of a series of factual assertions, which the Court construes as an attempt to show that Defendant's reasons are inconsistent. [Doc. 32] To the extent that Mr. Bussey disputes that he engaged in the behavior alleged, this argument is unavailing, because the Court's focus is on whether Mr. Collins and Mr. Conger had a good faith belief that he did so. In *Kendrick*, for example, the Court "assume[d] . . . that Kendrick's statement that he did not push [another employee] would create a genuine issue of fact as to whether or not Kendrick in fact pushed [the employee]." *Kendrick*, 220 F.3d at 1231. The Court stated that,

notwithstanding that assumption, "a challenge of pretext requires us to look at the facts as they appear to the person making the decision to terminate plaintiff." *Id*. It went on to hold that the plaintiff's argument that he did not in fact push the other employee was insufficient to show pretext, because the evidence before the decision-maker indicated that he had. *Id*.

Hence, the focus of the inquiry here is on the information before Mr. Collins when he recommended removal and before Mr. Conger at the time he made the removal decision. Most of the behavior cited in the disciplinary notices was observed by Mr. Collins personally. [*See, e.g.*, Doc. 28-13, ¶¶ c, d, e, g, h, i] Moreover, in his response to the Notice of Proposed Removal [Doc. 28-15], which was reviewed by Mr. Conger, Mr. Bussey did not dispute most of the allegations. Hence, as to those allegations, "[t]here was no evidence before [Mr. Conger] to suggest that [Mr. Bussey] had not, in fact," acted as described by Mr. Collins. *Id*. The fact that Mr. Bussey disputes some of the allegations in his *Response* to Defendant's *Motion* is immaterial to whether the evidence before Mr. Collins and/or Mr. Conger supported their decisions at the time. *See Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1251 (10th Cir. 2006) (discussing *Kendrick* and stating that "while the decision maker's conclusion about the plaintiff's conduct may have been wrong, [the *Kendrick* Court] saw no basis on which a reasonable fact finder could have found that it was not honestly held" and that claims that an employer's allegations were unfounded made for the first time during litigation are immaterial to examination of whether the employer had a good faith basis for discharge at the time).

Mr. Bussey disputed some of the facts stated in the Notice of Proposed Removal in his response to it. In his response, he disputed the facts alleged by Mr. Collins as to the encounter with other DTRA staff members on October 21, 2015. However, Mr. Bussey did not dispute that he used foul language and that the exchange was heated. [Doc. 28-15] Thus, the evidence before Mr. Conger was undisputed that Mr. Bussey used "abusive language toward co-workers." [Doc. 28-13] Mr. Bussey also disputed the alleged facts of his exchange with a colleague and denied that he hung up on the colleague. [Doc. 28-15] However, he admitted in his response that he refused to visit the colleague's office and that the telephone call was contentious. [*Id.*] These admissions, together with the reports by Mr. Collins, are sufficient to support Mr. Conger's good faith belief in a nondiscriminatory reason for discharge.

"A plaintiff may also show pretext . . . by providing evidence that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness." *Kendrick*, 220 F.3d at 1232. The only explicit references to disparate treatment in Plaintiff's pretext argument are the statements that, unlike Plaintiff, "White employees were not required to sign for vehicles" and that "Plaintiff is the only one who was given a letter of reprimand for allegedly failing to follow instructions." [Doc. 32, pg. 21] Mr. Bussey also implies that Mr. Collins treated him differently by failing to give him a written job description and resources as building manager and changing the policy regarding leaving the building. [Doc. 32, pg. 21-22]

These allegations and the evidence proffered in support do not meet Plaintiff's burden to show that the reasons given for his removal were pretextual. First, Mr. Bussey

has not demonstrated that the White employees within Mr. Collins' group had the same responsibility to conduct a vehicle inventory as Mr. Bussey did. Mr. Bussey testified in his deposition that "[t]here were about 20-plus personnel that had these vehicles on a daily basis, and they was not required to sign for them. . . . And they was all White." [Doc. 32-1, pg. 3, Bussey Depo, 22:2-10] He then stated, "I was not in charge of vehicles." [Doc. 32-1, pg. 3, Bussey Depo, 22:20-24] However, he also stated that the inventory of the vehicles was an "ad hoc duty," [Doc. 32-1, pg. 3, Bussey Depo, 22:20-24], that "[he] was the only one exercised with vehicles," and that his day-to-day duties consisted of "[w]hatever Mr. Collins requested [he] do that day." [Doc. 32-1, pg. 3, Bussey Depo, 23:5-6, 17-18] In addition, in his *Response* to Defendant's *Motion,* Mr. Bussey agrees that he was in charge of the vehicles assigned to Mr. Collins' department [Doc. 28, ¶ 7; Doc. 32, ¶ 7], and that Mr. Collins requested that he conduct the inventory and told him how to do it. [Doc. 28, ¶ 11; Doc. 32, ¶ 11] Even if the Court, construing the evidence in Mr. Bussey's favor as it must, assumes that White personnel were not required to sign for the vehicles under their charge, Mr. Bussey's evidence does not indicate that any White personnel were assigned to do a similar vehicle inventory and yet were not disciplined for failure to conduct the inventory as instructed. To the contrary, Mr. Bussey's own testimony indicates that he was the only one tasked with that particular inventory, whether as part of his regular duties or as an "ad hoc" duty. Since the charge in the Letter of Reprimand was "failure to follow instructions," and Mr. Bussey does not dispute that he was instructed to conduct the inventory but did not, his testimony that

White employees were not disciplined for failure to sign for their vehicles is unavailing to raise a question of fact surrounding pretext.

Similarly, Mr. Bussey does not provide support for his implication that, because he is African American, he was not given written guidance or resources as building manager or that Mr. Collins changed the policy regarding leaving the building in order to discriminate against Mr. Bussey. [Doc. 32, pg. 21-22] He does not dispute that the change in policy applied to all staff in Mr. Collins' department. [Doc. 32, ¶ 24] Neither does he provide evidence that non-African American building managers were given resources and/or that non-African American employees were not required to follow the policies regarding leave and absences.

Finally, Mr. Bussey argues that he was not afforded an opportunity to respond to notices of proposed suspensions issued prior to the Notice of Proposed Removal. [Doc. 32, pg. 21] Mr. Conger stated that Mr. Bussey filed responses to each of the proposed suspensions and the proposed removal. [Doc. 32-1, pg. 16, Conger Depo, 12:6-12] Moreover, the Notices were all signed by Mr. Bussey and each contained instructions on how to file a response. [Docs. 3, 5, 12, 13] The evidence on which Mr. Bussey relies to the contrary indicates only that Mr. Bussey did not receive an opportunity to respond to Mr. Collins' memorandum to the file. [Doc. 28-4; Doc. 32, ¶ 23] That evidence therefore does not address the assertion that Mr. Bussey had an opportunity to respond to the proposed suspensions.

In sum, although Mr. Bussey made out a prima facie case for discriminatory discharge, he has not met his burden to demonstrate that there is a genuine issue of

material fact surrounding whether Defendant's reasons for his removal were pretextual. *Id*. at 1234 (concluding that the district court did not err in granting summary judgment where the plaintiff put forth a prima facie case of discriminatory discharge, but failed to rebut the defendant's legitimate reasons for discharge with evidence of pretext).

*b. Discriminatory Treatment*

Just as with a discriminatory discharge claim, once a prima facie case of discriminatory treatment is established, the defendant must put forth legitimate, non-discriminatory reasons for the action, and then the plaintiff must demonstrate that those reasons are merely pretextual. *Trujillo*, 157 F.3d at 1215. To establish a prima facie case of discriminatory treatment, a plaintiff must show "(1) that he is a member of a racial minority, (2) that he suffered an adverse employment action, and (3) that similarly situated employees were treated differently." *Id.*. "In the context of a Title VII discrimination claim, an adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Juarez*, 263 F. App'x at 737–38 (internal quotation marks and citation omitted). "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Id.* (internal quotation marks and citation omitted).

Mr. Bussey contends that he has met his burden to demonstrate that he was treated differently from similarly-situated employees. He alleges that "Plaintiff was the only one who was disciplined for not following instructions regarding the vehicle fleet." [Doc. 32,

pg. 19]  However, as just discussed, Mr. Bussey has not shown that there were similarly situated individuals of another race who were tasked with completing a vehicle inventory who were treated differently from him.  Hence, he has not met his burden to establish a prima facie case of discriminatory treatment and the Court's inquiry under *McDonnell Dougla*s is complete.

Because Mr. Bussey failed to show that there is a genuine dispute of fact related to whether Defendant's reasons for his removal were pretextual, summary judgment in favor of Defendant is appropriate and will be granted as to Plaintiff's discriminatory discharge claim (Count 1).  To the extent Mr. Bussey asserts a discriminatory treatment claim (Count 1), summary judgment will be granted because Mr. Bussey has failed to make a prima facie case on that claim.

*c.  Title VII Retaliation*

"The general approach to Title VII suits set out in *McDonnell Douglas* is also applicable to retaliation claims" based on Title VII.  *Sorensen v. City of Aurora*, 984 F.2d 349, 353 (10th Cir. 1993).  The plaintiff must therefore begin by establishing a prima facie case of retaliatory discharge.  In order to do so, "a plaintiff must show: (1) she engaged in protected activity; (2) she subsequently suffered adverse action by the employer; and (3) there was a causal connection between the protected activity and the adverse action."  *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1367 (10th Cir. 1997).  As to the third prong of this test, "[i]n order for an action to constitute retaliation for protected conduct, the actor must *know* an employee previously engaged in protected conduct."  *Greenlee v. Sw. Health Sys., Inc.*, No. CIVA 06CV00103 EWNKL, 2007 WL

2320544, at *12 (D. Colo. Aug. 10, 2007). However, "knowledge alone will not suffice" and "[t]here must also be evidence giving rise to a reasonable conclusion that the actor's motive for taking adverse action was his *desire to retaliate* for the protected activity." *Id.*

Defendant concedes that Mr. Collins and Mr. Conger knew about Mr. Bussey's participation in an MSPB hearing. [Doc. 28] It argues that because "over a year passed" between Mr. Bussey's testimony at the MSPB hearing and his removal, Mr. Bussey has failed to demonstrate a causal connection between the two events. [Doc. 28] In response, Mr. Bussey relies on the temporal proximity between the MSPB hearing and the issuance of the Letter of Reprimand, both of which occurred in January 2015, as evidence that Defendant's disciplinary actions, which culminated in removal, were retaliatory. [Doc. 32 ("Only after Plaintiff testified at the EEO proceeding did Plaintiff ever receive any discipline.")] The "Tenth Circuit has recognized that 'a pattern of adverse personnel actions over a period of weeks or months may demonstrate an employer's retaliatory animus notwithstanding the absence of close temporal proximity between the employee's initial protected activity and the employer's ultimate [adverse action].'" *Semsroth v. City of Wichita*, 548 F. Supp. 2d 1203, 1211–12 (D. Kan. 2008), *aff'd,* 555 F.3d 1182 (10th Cir. 2009) (quoting *Steele v. Kroenke Sports Enters., L.L.C.,* 264 Fed.Appx. 735, 746 (10th Cir.2008)). However, even if Mr. Bussey is correct that the temporal proximity between the MSPB hearing and the letter of reprimand is sufficient to establish a causal relationship, hence establishing a prima facie case for retaliation, Mr. Bussey has not carried his burden as to the third prong of the *McDonnell Douglas* analysis, i.e., demonstrating that there are genuine disputes of material fact as to

whether Defendant's legitimate, non-discriminatory reasons for his discipline and eventual removal were pretextual. Instead, he relies on the same allegations discussed above which the Court has already determined are insufficient to raise a question of fact on this issue. Mr. Bussey's argument that Mr. Conger's failure to adequately investigate his allegations of discriminatory treatment is evidence of discriminatory intent is also unavailing. [Doc. 32, pg. 25] Without evidence that Defendant's policy was to investigate such allegations or that Mr. Conger investigated similar allegations made by other employees, Mr. Bussey's assertions do not support an inference that Mr. Conger failed to investigate *because of* Mr. Bussey's protected activity. *Cf. Lueck v. Cushing Mem'l Hosp. Corp.,* No. 10-CV-04025-JAR, 2011 WL 4900118, at *7 (D. Kan. Oct. 14, 2011) (stating that, where the plaintiff "offered no evidence of a policy, written or unwritten, to suggest defendant would usually report [certain conduct to a regulatory body]," a failure to report was not evidence of pretext even if it "would have been advisable" to do so). Mr. Bussey has "failed to bring forward evidence to show that retaliatory motive was a determinative factor in h[is] dismissal." *Piercy v. Maketa*, 480 F.3d 1192, 1202 (10th Cir. 2007). Summary judgment in favor of Defendant will therefore be granted on this issue.

## C. Jurisdiction over Remaining WPEA Claim

Where the federal district court's jurisdiction rests on the filing of a mixed case, such as this one, and the discrimination claims are dismissed, the court may "(1) retain jurisdiction over the nondiscrimination claim, or (2) transfer the case to the Federal Circuit under 28 U.S.C. § 1631." *Afifi v. U.S. Dep't of Interior*, 924 F.2d 61, 64 (4th Cir.

1991).  In exercising its discretion, the district court must consider the following factors:

"judicial economy, convenience, concerns for federalism, and fairness to litigants."  *Id.*

Here, these factors weigh in favor of retaining jurisdiction over Plaintiff's

nondiscrimination based WPEA claim.  The facts surrounding Plaintiff's whistleblowing

activities are closely interwoven with the disciplinary actions against him.  "The Title VII

pretext analysis . . . overlaps to a large extent with whether the MSPB properly sustained

those reasons for [Mr. Bussey]'s removal."  *Ali v. Brown*, 998 F. Supp. 917, 928 (N.D.

Ill. 1998).  This Court has already reviewed Defendant's reasons for Plaintiff's removal;

transfer to the Federal Circuit "would not only waste the resources [it has] already

committed to the case, it would also spawn duplicative efforts in the Federal Circuit."  *Id.*

Because this Court already "spent considerable resources in addressing de novo the

propriety of removal in the discrimination context[,] [it] will expend scant more if [it]

retain[s] jurisdiction to review it in the appellate context, where [the] inquiry is much less

searching."  *Id.*  Moreover, transfer will delay resolution of the matter, "which would be

inconvenient and unfair to the litigants and would not serve the interests of judicial

economy."  *Hamilton v. Dep't of Labor*, No. 04 CIV. 9605 (PKC), 2006 WL 760276, at

*6 (S.D.N.Y. Mar. 22, 2006).  The Court will, therefore, exercise its discretion to retain

jurisdiction over the WPEA claim.

**III.    Conclusion**

For the foregoing reasons, the Court **GRANTS** Defendant Department of

Defense's *Motion for Summary Judgment* [Doc. 28] as to Counts 1 and 2 of the

*Complaint* and **DENIES** the *Motion for Summary Judgment* [Doc. 28] as to Count 3 of the *Complaint*.

 **FURTHERMORE**, Defendant Department of Defense is hereby **ORDERED** to cause the administrative record of proceedings before the MSPB to be filed consistent with Rule 16 and 17 of the Federal Rules of Appellate Procedure.

 **SO ORDERED this 5th day of April, 2018.**

**M. CHRISTINA ARMIJO**
**United States District Judge**